# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DARLENE LOW,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-CV-0398-CVE-PJC** |
| | ) | <u>**BASE FILE**</u> |
| **STEVEN CHU,** | ) | |
| **The Honorable Secretary of the Department** | ) | |
| **of Energy in his official capacity as an officer** | ) | **Consolidated with** |
| **of the United States,** | ) | **Case No. 09-0505-CVE-PJC** |
| | ) | |
| **Defendant.** | ) | |

## <u>OPINION AND ORDER</u>

Now before the Court are Plaintiff's Opening Motion and Brief for Summary Judgment (Dkt. # 62) and Motion of Defendant Steven Chu For Summary Judgment and Brief in Support Thereof (Dkt. # 70). Each party argues that it is entitled to summary judgment on plaintiff's remaining claims for relief: hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et</u> <u>seq.</u> (Title VII), and discrimination based on gender and/or retaliation relating to plaintiff's inability to apply for her supervisor's position in 2008.[1]  Dkt. ## 62, 70.

---

[1]     All other claims of plaintiff were previously dismissed. Only the hostile work environment claim survived defendant's motions to dismiss in the base case, Case No. 09-CV-0398-CVE-PJC. Dkt. ## 22, 35. The discrimination claims originated in Case No. 09-CV-0505-CVE-PJC, another case arising out of Low's employment with the Southwestern Power Administration (SWPA). Dkt. # 37. In Case No. 09-CV-0505, plaintiff's "sole claim" is that she "was intentionally discriminated against because of her sex and/or retaliation for a discrete employment action" (Case No. 09-CV-0505, Dkt. # 33). That case was consolidated with Case No. 09-CV-0398. Dkt. # 39. References to documents filed in Case No. 09-CV-0398 prior to consolidation or in the base file after consolidation will be made by docket number only. References to documents filed in Case No. 09-CV-0505 prior to consolidation will be accompanied by the case number.

# I.

Darlene Low is a female federal employee. Dkt. # 13, at 1-2. Her claims arise out of her employment with the SWPA, an agency within the United States Department of Energy (DOE). In August 2000, Low and SWPA entered into a settlement agreement relating to Low's then-pending discrimination claims before this Court. Low alleges that the settlement agreement "specifically calls for [her] to become a GS-14 and also assume the agency's Environmental Program . . . ." Id. She further alleges that SWPA complied with the settlement agreement until August 2007, when "SWPA unilaterally removed the Environmental Duties . . . ."[2] Id.

In May or June 2007, Dallas Cooper, Low's supervisor, suggested to Low that he remove some of her environmental responsibilities so that she could focus on safety issues. Dkt. # 70, at 9.[3]

---

[2]    Plaintiff alleges that the removal of her environmental duties altered her classification from GS-14 to GS-13, resulting in a breach of the settlement agreement. E.g., Dkt. # 62-4, at 52. Defendant has repeatedly stated that plaintiff remained a GS-14 regardless of the environmental duties because her grade was driven by the settlement agreement, not by general classification standards. Dkt. ## 62, at 8-9; 62-3, at 2-13.

[3]    Plaintiff disputes the legitimacy of any safety concerns. However, it is clear that in December 2006, a set of memos was sent to SWPA administrator Michael Deihl from the Department of Energy. Dkt. # 62-3, at 50-58. These memos clarified safety goals surrounding the President's and Secretary of Department of Labor's Safety, Health, and Return-to-Employment (SHARE) Initiative. Id. at 55. One of the memos also stated that SWPA was one of the highest contributors to total workers' compensation case rates for the department, and made a recommendation that SWPA and other high contributors establish "specific SHARE goals to reach continuous improvement of the safety and health protection program for DOE Federal employees and meet the overall DOE SHARE goals." Id. at 52. Further, on March 19, 2007, SWPA's managers, supervisors, and team leaders sent a memo to Deihl regarding actions at SWPA taken to promote improvement in safety awareness, safe work practices and safety management. Id. at 67-68. This memo was signed by Low. Id.

Plaintiff also disputes the validity of SWPA's expressed concerns based on violations of Environmental Protection Agency (EPA) regulations in 2006 and 2007. Cooper testified that his decision as to how to resolve the violations led to conflict among him, Low, and Mistie Yost, a contractor assigned to environmental duties. Dkt. ## 24, at 33-36; 62, at 16.

Low and Cooper exchanged e-mails discussing a change in her duties throughout June 2007.  E.g., Dkt.# 62-3, at 15-16.  Cooper stated that he met with Low on August 22, 2007, and told her that he wanted to take over the environmental program for six months.[4]  Dkt. ## 62-4, at 5; 70, at 9.  On August 23, 2007, Cooper sent an e-mail to SWPA employees stating that he would be coordinating environmental program oversight. Dkt. ## 62-3, at 14; 70-3, at 18.  On August 28, 2007, Low sent Cooper an e-mail stating "I request to know in writing my responsibilities after February 2008.  I want the change in my responsibilities as of August 23, 2007 documented in a personnel action." Dkt. ## 24-3, at 42; 70, at 9.  Cooper responded that he wanted the change to be informal, and stated that he was confused because he had intended the change to be temporary. Dkt. ## 62-4, at 47; 70 at 9-10.  On August 29, 2007, Low sent Cooper an e-mail requesting documentation if her environmental duties were to be reassigned for six months.  Id. Cooper responded, "[t]o make it a smoother transition I will formally change your [position description] and I will assume the environmental responsibilities myself.  This will be a permanent change so there is no confusion." Dkt. ## 24-3, at 43; 70, at 9.

On July 15, 2008,[5] Cooper sent an e-mail to Low apologizing for not getting the formal paperwork completed.  He asked her "once again if this works for you," since the formal position change had not been issued.  Dkt. ## 24-3, at 44; 70, at 10.  On August 4, 2008, Cooper sent Low another e-mail stating that he had not received a response to his July 15 e-mail.  Dkt. ## 24-3, at 46; 70, at 11.  He further stated that he had decided not to change Low's position description and

---

[4]     Low alleges that Cooper did not take over the environmental program, and that the responsibilities were given instead to Yost, a younger female contractor.  Dkt. # 13, at 2.

[5]     Cooper was on extended sick leave from January through April, 2008.  Dkt. ## 24-1, at 2; 70, at 10.

performance standards, and would have her resume her environmental duties on August 18, 2008. Id. On August 7, 2008, Low met with Jon Worthington, the new SWPA Administrator who had replaced Deihl; Shirley Shumate, SWPA's Collateral Duty EEO Manager, was also asked to join the meeting to take notes. Dkt. ## 70, at 11; 70-3, at 20. In that meeting, Worthington repeatedly asked Low if she wanted the environmental duties. Dkt. # 62, at 17. Low alleges that this was intimidating. Dkt. # 13, at 4, 11. Shumate testified that Low's focus throughout the meeting was on her dislike of Yost and that Worthington's repeated statements were an effort to shift the focus to Low.[6] Dkt. ## 62-4, at 18-33; 72-2, at 13-15. Following the meeting, Low sent an e-mail to Worthington thanking him for the opportunity to meet and stating that she agreed "with the decision to remove the environmental program from [her] responsibility and position description." Dkt. # 70-3, at 21.

On August 12, 2008, Cooper signed an SF-52 "Request for Personnel Action" form that reflected a change in Low's position number. Dkt. ## 70, at 12; 70-4. At some point, a form SF-50 "Notification of Personnel Action" was prepared. This form stated that the effective date of Low's reassignment was August 17, 2008, and that the action was at the employee's request. Dkt. ## 24-2, at 47; 70, at 12. On August 18, 2008, Low sent an e-mail to Worthington, Cooper, and others, stating that the date and remarks section of the SF-50 needed to be corrected. Dkt. ## 70, at 12; 70-3, at 26. On August 25, 2008, Worthington and Shumate visited plaintiff's office to discuss the SF-

---

[6]     The Court finds wholly unpersuasive plaintiff's attempts to discredit Shumate by pointing to small differences in testimony she gave in 2008 and 2009. Dkt. # 77, at 7-10.

50 and plaintiff's August 18, 2008 e-mail.[7]  Dkt. # 70, at 12.  The same day, Worthington sent Low

an e-mail to confirm that the SF-50 would read "action taken by mutual agreement."  Id.; Dkt. # 70-

3, at 27.  Low responded by e-mail that day and stated that she never agreed to a reduction of duties.

Dkt. # 70-3, at 28-29.  She sent an additional e-mail on August 26, 2008 that stated, "[a]s I am

rapidly approaching the end of the '45 day notice period,' I need to move forward and initiate an

EEO claim."  Id.; Dkt. # 70-3, at 31-32.

Cooper announced his retirement from his position as Assistant Administrator for Corporate

Facilities in 2008.  Case No. 09-CV-0505, Dkt. # 33, at 3.  In the replacement vacancy

announcement, issued September 3, 2008, the position occupation series was changed from the

managerial series to one "requiring one of three specific categories of engineering."  Id.; Dkt. # 70,

at 14.  Selective factors[8] for the position were management, supervision, and business experience.

The position was open for qualified applicants from September 3 to October 3, 2008.[9]  Dkt. ## 70,

---

[7]     At this meeting, Worthington said something to the effect of Low being able to maintain her
grade even if she were doing secretarial work.  Low testified that she found this comment
demeaning.  Worthington stated that he was trying to explain that, due to the 2000 settlement
agreement, Low would keep her GS-14 grade regardless of her actual responsibilities.  Dkt.
## 62, at 17; 62-4, at 29; 72, at 18; 74-2, at 11.

[8]     A "selective factor" is a "knowledge, skill, ability, competency, or special qualification
without which a candidate could not perform the duties of the position in a satisfactory
manner.  Selective factors are applied in addition to minimum qualifications.  Applicants
who do not meet a selective factor are ineligible for further consideration."  Dkt. # 70-4, at
29-30 (emphasis in original).

[9]     Due to a lack of qualified applicants, a modified version of the job announcement was open
for applicants from October 20 to November 21, 2008; selective factors were altered to
include management and supervision, engineering, business knowledge, and communication.
Dkt. # 70-5, at 10-16.

at 14; 70-4.  Plaintiff does not have an engineering degree, and did not apply.[10]  Dkt. # 70, at 14.

Margaret Skidmore, a human resources specialist at SWPA, testified that position series was

changed to engineering as the result of a review and update of the position description.[11]  Dkt. # 70-

5, at 18-21.

Low first contacted an EEO counselor on August 26, 2008.  Dkt. # 30, at 8.  She filed a

formal discrimination charge with DOE on September 28, 2008.  Dkt. # 15-2, at 35-36.  DOE issued

its Notice of Final Agency Decision on May 26, 2009.  Dkt. # 24-3, at 13.  The notice states that the

following issues were accepted and investigated:

> Whether a continuing violation occurred based on retaliation, sex (female), and age
> (66) discrimination when, Complainant alleges, a major portion of her duties were
> removed on August 29, 2007, and given to a younger female; the alleged position
> change was not documented in a personnel action  . . . [,] and the Administrator
> would not correct the situation or document the change in August 2008[;] [w]hether
> Complainant was discriminated against on the basis of retaliation when the
> Administrator allegedly subjected her to intimidation on August 7 and August 25,
> 2008, and made a disparaging statement regarding her work opportunities[; and]
> [w]hether the[se] allegations  . . . constitute a hostile work environment."

Id.  DOE dismissed Low's claim regarding the August 29, 2007 removal of her duties as untimely:

---

[10]     Low alleges that she and Cooper were previously in the same occupational series ((301)
Program Manager), and that she would have qualified for his job.

[11]     Skidmore testified that the review, performed in anticipation of Cooper's impending
retirement, was a routine function performed by human resources.  Dkt. # 70-5, at 19.  She
further explained the change in occupational series as the result of shifts in duties for the
Assistant Administrator (including expansion of the supervisory reach to include the SWPA
Department of Engineering), and the retirement of employees knowledgeable about
engineering matters.  Id. at 19-20.  Worthington confirmed that his desire to have an
engineer fill the vacancy left by Cooper's retirement stemmed from added responsibilities
for the engineering program and the fact that Worthington lacked the engineering
background of his predecessor, Deihl.  Dkt. # 70-2, at 21-22.

Throughout correspondence with the Investigator and in the rebuttal statements provided,[12] Complainant refers to the alleged discriminatory events occurring as early as April 2007, and that the alleged removal was made permanent in August 2007. Accordingly, Complainant's delay until August 2008 to seek counseling renders this claim untimely.

Dkt. # 24-3, at 23 (citations omitted). Further, DOE found that Low had not made a prima facie case of discrimination on any of her other claims. Id. at 22-33.

Low subsequently filed two additional formal discrimination charges with DOE. On October 17, 2008, Low filed an EEO charge with DOE alleging that "since 1989 when coming to SWPA, [she has] been unable to apply for [her] supervisor's position." Case No. 09-CV-0505, Dkt. # 23, at 17. She alleged that she could not apply for the position because it was advertised in an engineering series. Id. The attached agency counselor's report states that Low wanted the Assistant Administrator for Corporate Facilities position re-advertised to include the managerial series in addition to the engineering series.[13] Id. at 19.

On January 24, 2009, Low filed an EEO charge with DOE alleging that "since inception in 1943, with concurrence from its Federal Department (now DOE), SWPA intentionally and systematically excludes **_Females_** from the GS-15 level and above." Id. at 31 (emphasis in original). The charge also stated that it was a class action.[14] Id.

---

[12]    Low's counsel provided to DOE rebuttal statements and his own analysis of testimony offered in connection with the investigation. Dkt. # 24-2, at 11-41.

[13]    In December 2008, Low sent a letter to DOE stating her intent to pursue this claim as a class complaint. Case No. 4:09-CV-0505, Dkt. # 23, at 27.

[14]    Plaintiff was allowed to amend her second amended complaint to eliminate any class claims. No. 09-CV-0505, Dkt. # 32.

Low attached to her January 2009 charge several pages of allegations under the heading "[r]easons **_why_** women have been excluded from senior management . . . ."  Dkt. # 25, at 11 (emphasis in original).  Some of these allegations relate specifically to Low: comments made by supervisors, id.; failure to give Low opportunities for training or a mentor, id. at 12; Low's inability to apply for her supervisor's position in 1999, id.; Low's inability to apply for her supervisor's position in 2008 due to the engineering requirement in the vacancy announcement, id. at 13; designation of Low as "qualified," rather than "highly qualified" for an unspecified GS-15 position for which Low applied but was not selected, id. at 14; Low's never having been asked to be "acting," id. at 15; and selection of a male for a "long-term training assignment" for which Low "put in," id.

The following is a general timeline of Low's version of the major events in the consolidated cases.  In 1999, Low was unable to apply for her supervisor's position.  Low filed a suit in this Court, which was settled in 2000.  Pursuant to the settlement agreement, Low was placed in a new position at the GS-14 level.  In August 2007, Dallas Cooper removed some of Low's responsibilities and gave them to a younger female.  In 2008, Low and her supervisors engaged in numerous discussions regarding the removal of the environmental duties and the documentation of that decision.  Later in 2008, Low wanted to apply for the Assistant Administrator of Corporate Facilities position (previously held by Dallas Cooper), but was ineligible because the vacancy announcement required an engineering degree.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986);

Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most favorable, Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

## III.

Low's remaining claims in the consolidated case are for hostile work environment and discrimination based on gender or retaliation.

A.    **Hostile Work Environment (Case No. 09-CV-398)**

Plaintiff's fourth claim for relief in her amended complaint alleges that:

Since April, 2007, Defendant has openly exhibited hostility toward Plaintiff in testimony under oath by the actions themselves or others describing behavior, documents of record, and actions documented by records or lack of records. Much of Defendant's behavior while retaliating against Plaintiff likewise created a hostile work environment, especially main actors who had direct power over her, Mr. Cooper and Mr. Worthington. Plaintiff, at considerable mental stress and anguish, was often unable to physically remove herself away from her supervisor, Mr. Cooper, until he retired. Actions by Defendant unreasonably interfered with Plaintiff's work performance which continue today and were objectively intimidating, hostile, offensive, and debilitating. Behavior was directly the result of Plaintiff asserting protected rights <u>and</u> repeated attempts over several months, generated by both Mr. Cooper and then, Mr. Worthington. As a result of actions of Defendant's agents, Plaintiff has been belittled; has had a loss of self esteem & purpose; is often embarrassed & otherwise in emotional discomfort in official group functions, particularly when Jon Worthington is present, and as a result, withdraws from office activities; and has lost all hope of advancement.

Dkt. # 13, at 11-12.[15] The Court has previously interpreted plaintiff's fourth claim as one for hostile work environment and/or retaliation. Dkt. # 57. Plaintiff now argues only the hostile work environment aspect of this claim, and the Court will similarly limit its analysis. Dkt. # 62, at 24-29. Moreover, because plaintiff clarified in response to defendant's summary judgment motion that her

---

[15]    Although plaintiff's allegations are admittedly nonspecific, construing them in the light most favorable to plaintiff, the Court finds that they state a claim for relief that is plausible on its face under the standard articulated in <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544 (2007). Therefore, defendant's argument that plaintiff's claim for hostile work environment should be dismissed for failure to state a claim is rejected. Dkt. # 80, at 1-2.

hostile work environment claim is based only on gender, the Court will consider her claim in that light.[16]  Dkt. # 74, at 26.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  "An individual can make a claim of sex discrimination based on a hostile work environment, but in order to do so, [she] must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Howell v. N.M. Dep't of Aging & Long Term Servs., 2010 WL 3965927, at * 2 (10th Cir. Oct. 12, 2010)(quoting Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009)).  Courts look to the totality of the circumstances in determining whether a workplace was sufficiently hostile, including "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." MacKenzie v. City and Cnty. of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005).  "The environment must be both subjectively and objectively hostile or abusive." Id.

Because plaintiff states that her hostile work environment claim is based on gender, she must first show that she was the subject of gender-based discrimination.  Plaintiff bases her hostile work

---

[16]  Defendant argues that plaintiff's hostile work environment claim did not include a gender basis, and that she should therefore not be allowed to amend her complaint in summary judgment proceedings. Dkt. # 80, at 5.  However, construing plaintiff's complaint broadly, the Court finds that a gender claim for hostile work environment fits within the allegations of her complaint.

environment claim on a number of incidents.[17]  These include her background,[18] her reduction in duties,[19] Cooper's statements that she would be given additional duties, her two meetings with Worthington in August 2008 (in her words, "the underlying events of the Hostile Environment Claim"),[20] and the failure to classify her positions and to document her reassignment properly,

[17]   Defendant argues that plaintiff should be limited in this claim to allegations regarding events beginning August 29, 2007, because that is the date first alleged in her EEO complaint.  Dkt. # 70, at 20.  The limits of plaintiff's hostile work environment claim were not previously before the Court.  Dkt. # 35.  For purposes of this motion only, the Court will assume that all of the allegedly hostile actions taken by defendant were "part of the same actionable hostile work environment practice" and that they were properly exhausted, and will therefore not limit its analysis to events after August 29, 2007.  Duncan v. Manager, Dep't of Safety, City and Cnty. of Denver, 397 F.3d 1300,  1308, 1310 (10th Cir. 2005).  Moreover, while events not probative of a gender bias would not be admissible at trial, see Burleson v. Sprint PCS Group, 123 F. App'x 957 (10th Cir. 2005), given plaintiff's unusual theory of gender discrimination and the vague nature of her hostile work environment claim, the Court will consider this evidence for purposes of the summary judgment motion.  Id. at 961 n.1.

[18]   Plaintiff refers to the history of her prior lawsuit and the current proceedings, which she says made her the target of the "informal communication system" at SWPA, resulted in her being shunned by colleagues, and caused Cooper to "push[] [her] aside and exclude[] and demean[] [her]."  Dkt. # 74-2, at 3-5.

[19]   Plaintiff refers to the assignment of some of her duties to a contractor, and alleges that safety was later fabricated as justification for the transfer of these duties.  Dkt. # 74-2, at 7.  She claims that the removal of these duties based on fabricated reasons and her failure to gain supervisory experience constituted a breach of the settlement agreement.  Dkt. # 62, at 25.

[20]   Plaintiff states that her meetings with Worthington were the result of a series of events that began with her responsibilities being given to a younger female contractor known to have a personal relationship with Low's supervisor.  At the meeting with Worthington at which she attempted to air her concerns, she alleges that Worthington's repeated inquiries as to whether she still wanted the environmental duties created an atmosphere "like an old TV scene where the suspect is repeatedly questioned until a confession is made, less spotlight and smoke," and that she felt like she had been interrogated.  Dkt. # 74-2, at 9-10.  She further alleges that she was ambushed by Worthington's attempts to resolve the issue of documentation on the SF-50, and that she agreed to his suggested documentation only under pressure.  She characterizes Worthington's later conversation with her in her office and statement that she could remain a GS-14 even as a secretary as "the most belittling and disparaging remark ever made to [her] in [her] entire life."  Finally, she cites Worthington's
(continued...)

including the improper maintenance of her SF-50 form.  Dkt. # 62, at 25-26.  She further alleges that

hostile comments were made to her by a supervisor,[21] that her complaints to the Inspector General

(IG) of DOE were ignored,[22] that she was deemed insubordinate for making complaints to her

administrators, and that "ten employees of [d]efendant knew of some or all of deception toward

[p]laintiff and not a single one rose up to assist."  Dkt. # 62, at 25-26.  She argues that she is

frequently the subject of gossip at SWPA, that she has been shunned by a number of her colleagues,

and that she no longer feels comfortable in the workplace.  More specifically, she points to perceived

---

[20]    (...continued)
attempts to elicit her agreement to documentation that her duties were removed by mutual
agreement, and his offer to write a letter absolving her of responsibility for the EPA
violations (which she says in no way involved her), as contributing to the hostile work
environment.  Id. at 11-12.

[21]    Plaintiff alleges that Gene Reeves, an assistant administrator and former acting administrator
at SWPA resented her and that he required her to take all of her proposed safety orders to
him for approval, made negative remarks about her title, and once told her that she did not
earn her position.  Dkt. # 74-2, at 13.

[22]    Prior to her lawsuit, Low's husband (and attorney) contacted the IG and had several
conversations with staffers in the office; plaintiff alleges that the IG never responded or
offered to help.  Dkt. # 74-2, at 12.

workplace hostility in incidents such as the 2009 ice storm,[23] her deposition of 2009,[24] and her exclusion from rotational details.[25]

None of these incidents shows gender-based discrimination against plaintiff.[26] Perhaps in recognition of this failure of a necessary element, Low cites <u>Croy v. Cobe Laboratories</u>, 345 F.3d 1199 (10th Cir. 2003), for the proposition that "in the Tenth Circuit, a proven Glass Ceiling would be proven hostile environment or discrimination per se."[27] Dkt. # 74, at 8. In that vein, plaintiff

---

[23] In February 2009, an ice storm required plaintiff and others from her office to travel to the site of the storm. Dkt. # 72-2, at 13. Plaintiff did not have a hotel reservation, and had to stay in a hotel room without a functioning lock. <u>Id.</u> Worthington and others arrived the next day. Plaintiff alleges that Worthington wanted to make her feel excluded and unwelcome to travel with the group. <u>Id.</u> at 13-14.

[24] On May 11, 2009, plaintiff was required to attend a deposition even though she did not feel well. Dkt. # 74-2, at 14. She alleges that she was intimidated by the four government representatives who sat across from her and "stoically stared directly" at her during the deposition, and that she cut short her answers in an unfavorable way because of the intimidating environment. <u>Id.</u> at 13-14.

[25] Plaintiff alleges that three other women in the Tulsa office at the GS-14 level were selected for rotations that would give them training in the job responsibilities of assistant administrator who was soon to retire, and that she was excluded over her protest. Dkt. # 74-2, at 16.

[26] Although plaintiff argues that the removal of her duties was part of the hostile work environment based on gender, by her own admission, those duties were reassigned to a female contractor. Therefore, that removal is not evidence of gender discrimination. Dkt. # 74-2, at 8.

[27] Plaintiff articulates her argument as follows:

> Defendant has and continues to maintain a Glass Ceiling on advancement to Senior Management for all females which is extremely pervasive and has significantly altered a significant term of employment, especially Plaintiff who had legally challenged ceiling and currently sought to be promoted to senior management level – the GS-15 level.

Dkt. # 62, at 25.

claims that she has presented direct evidence of discrimination through the following: (1) statistical evidence; (2) a claim that "[d]efendant has specifically crafted a ceiling to prevent [p]laintiff from further advancement by denying her GS-14 duties required from a settlement agreement"; (3) a position audit that showed her current responsibilities to be GS-13[28]; and (4) her inability to gain supervisory experience at SWPA.[29]

Plaintiff's reading of <u>Croy</u> is inaccurate.[30]  However, even if a general showing of systematic discrimination toward women could satisfy the requisite showing of gender-based animus toward an individual, plaintiff makes no such showing.  Plaintiff has offered statistics showing a lack of women at SWPA, as well as her own anecdotal observations.[31]  Dkt. ## 62, at 3; 67, at 3-12.

---

[28]    Plaintiff requested a position audit on May 4, 2010.  Dkt. # 74-2, at 15.  She alleges that although four people in the SWPA office were qualified to do the audit, an outside auditor was brought in.  <u>Id.</u>  He concluded that her position should be classified as a GS-13.  <u>Id.</u>  However, she alleges that others at SWPA explained that the auditor's results need not be accepted, and that another audit would be sought.  <u>Id.</u>

[29]    Low attributes this inability to gain supervisory experience to defendant's failure to comply with terms of the settlement agreement through the removal of her environmental duties, and points to the circumstances surrounding the removal of those duties as evidence of discrimination.

[30]    In <u>Croy</u>, the plaintiff failed to file an EEOC complaint within the required 300-day period, but argued that her claim was saved by the continuing violations doctrine.  345 F.3d at 1202.  The court noted that although the plaintiff had not stated a claim for hostile work environment, her allegations concerning a glass ceiling were similar in nature, and it therefore decided to apply the continuing violations analysis appropriate for hostile work environment claims.  <u>Id.</u>  Nowhere did the court make any statement regarding the sufficiency of a showing regarding a glass ceiling in making a hostile work environment claim.

[31]    For instance, plaintiff submitted an affidavit recounting the absence of women in SWPA's field crews.  The affidavit states that Low conducted an investigation based on information available to her that revealed that, of the 72 employees with primary work "on the power lines and electrical substations," there were no women, and that plaintiff recalls only one woman in such a position in her 21 years of employment with SWPA.  Dkt. # 74-2, at 19.

Noncontextual statistics do not raise a genuine issue of material fact that the lack of women at SWPA, to the extent such a condition exists, is the result of gender discrimination, nor that such gender discrimination was responsible for any of defendant's actions toward her. See Turner v. Pub. Serv. Co. of Colo., 563 F.3d 1136, 1147 (10th Cir. 2009)(rejecting statistics as evidence of gender-based bias where statistics submitted to the court failed to provide information regarding whether the decision to hire a plaintiff was based on gender and broader statistical evidence of gender imbalance in workplace did not include information about the number of "male and female applicants, interviewees, and the like," making the statistics "nearly meaningless").

Nor is anecdotal evidence about the absence of women at the power line level relevant to plaintiff's claims regarding her own ability to advance, as it does not, "without additional evidence, suggest that [plaintiff] herself experienced discrimination." Turner, 563 F.3d at 1147.  Contrary to plaintiff's assertions, the absence of women in certain job categories does not "speak for itself."[32] Dkt. # 74, at 10.  Even if the statistics were relevant, they do not offer any insight into SWPA policies that may have led to any existing imbalance.[33]  Moreover, even when given the opportunity to explain the basis for her theory of discrimination, Low has failed to do so.  For instance, at her deposition, the following exchange occurred:

---

[32]   In an unfortunately representative example of the frequently unintelligible nature of plaintiff's briefs, plaintiff directs the Court to "[a]lso note Administrator's lack of discussion to Congress of 'diversity,' yet discusses 'workforce planning.'  Also note general knowledge that females have long served in combat roles and now serve on American's submarines, not to mention conventional, civilian jobs."  Dkt. # 74, at 10.

[33]   Again, presentation of statistics without explanation of the manner in which the figures were achieved or information about the applicant pool is insufficient to support a finding of discrimination.  Turner, 563 F.3d at 1147.

> Q:     You felt that you personally were subjected to a hostile work environment. Do you believe that that was the case, because you're a woman?
>
> A:     Actually, yes, I do.  I don't believe that the men would have had to put up with what I did.
>
> Q.     What makes you think so?
>
> A:     That's just what I think.  Just from my observation.

Dkt. # 72-2, at 9.  "Conclusory allegations without specific supporting facts have no probative value," and do not create a genuine issue of material fact.  Myers v. Alliance for Affordable Servs., 371 F. App'x 950, 962 (10th Cir. 2010)(unpublished)[34].  Low has failed at every opportunity to make a connection between gender and any of the incidents upon which she bases her complaint.

At the same time, defendant has produced evidence showing opportunities to advance given to women at SWPA.  An affidavit from Lynn King, a human resources specialist at SWPA, states that a position advertised as GS-14/15 was offered to a woman, turned down, and then given to a man; another provides an example of a GS-14/15 position currently held by a female employee. Dkt. ## 62-2, at 4; 72-2, at 1.  Moreover, by plaintiff's own admission there were three other women at the GS-14 level who received training necessary to apply for a supervisory position. Dkt. # 74-2, at 17.   This evidence directly contradicts any claim that Low's inability to gain supervisory experience was the result of gender, and she has offered no evidence in rebuttal.  To be sure, "[a] sex discrimination claim does not fail simply because an employer does not discriminate against every member of the plaintiff's sex."  Strickland  v. United Parcel Serv., Inc., 555 F.3d 1224, 1230 (10th Cir. 2009).  However, as plaintiff has offered no evidence from which a reasonable jury could

---

[34]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

infer discrimination based on gender, she has failed to raise a genuine issue of material fact that gender discrimination existed at SWPA, let alone link that discrimination to actions taken against her.

Moreover, in the event that, despite her statement to the contrary, plaintiff's claim is one for hostile work environment based on retaliation,[35] plaintiff has not shown the incidents complained of to be sufficiently pervasive so as to create a hostile work environment. Claims based on hostile work environment will survive summary judgment only upon a showing of a "steady barrage of opprobrious . . . comments" that create a subjectively and objectively hostile environment. Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)(finding a "close question" as to whether racial harassment of the plaintiff in the form of repeated, specific discriminatory statements to him and others was sufficiently pervasive to support a claim for hostile work environment, but ultimately denying summary judgment); see also DeWalt v. Meredith Corp., 288 F. App'x 484, 495 (10th Cir. 2004)(unpublished)[36](rejecting plaintiff's claim for hostile environment based on generally ageist comments overheard by plaintiff and employer's nitpicking); Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005)(finding isolated incidents of racist comments insufficient to create actionable hostile environment).

---

[35]   For purposes of summary judgment, the Court will assume that a claim for hostile work environment based on retaliation for prior protected activity is cognizable. The question has not been decided by the Tenth Circuit. See Stover v. Martinez, 382 F.3d 1064, 1071, 1075 (10th Cir. 2004); Thorsberg v. Gen. Motors Corp., 2005 WL 2461169, at * 7 n.12 (W.D. Okla. Oct. 4, 2005)(citing Stover for proposition that "it [i]s unclear whether there is a hostile work environment retaliation claim").

[36]   Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

The events to which plaintiff points as evidence of a hostile work environment do not support such a finding.  First, it strains the limits of reason to find objectively offensive plaintiff's version of the "captive" meetings with Worthington, her exclusion from a group outing to the site of an ice storm, the environment of her deposition, and other conduct about which Low complains.  However, even assuming for purposes of this motion that such actions were objectively offensive, they do not constitute the steady barrage of incidents needed for a showing of hostile work environment.

The incidents upon which plaintiff primarily relies for her claim are circumstances surrounding the removal of her environmental duties and the aftermath.  Plaintiff cannot rely on meetings with her superiors regarding whether and how her duties would be removed as evidence of a hostile work environment, as she herself asked for many of these meetings.  Cf. MacKenzie, 414 F.3d at 1280 (finding that plaintiff could not consider silence on the part of employer hostile when plaintiff had sought such silence by filing a grievance against him).  And while plaintiff may not have liked how her employment situation was handled by SWPA, the Court's role "is to prevent unlawful employment practices, not to act as a super personnel department that second guesses employers' business judgments."  Trujillo v. Huerfano Cty. Bd. Of Cty. Comm'rs, 349 F. App'x 355, 364 (10th Cir. 2009)(unpublished)[37].  Plaintiff's complaints about the removal of her duties, her meetings with Worthington,[38] and the documentation of her position assignment are clear examples of the type of employee management decisions for which Title VII provides no relief.

---

[37]   Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

[38]   Indeed, at her deposition, plaintiff testified that her "main concern" with the meetings with Worthington was that he did not show her "much empathy" and that he was "very firm." Dkt. # 70-5, at 5.  Simply put, such concerns are not within the purview of Title VII.

Therefore, plaintiff's allegations of hostile work environment based on the manner in which her job responsibilities were redistributed are ill-founded.  And even if the few specific comments made to plaintiff, such as Worthington's statement that her duties could be reduced to those of a secretary, could be deemed offensive, "a plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents of . . . enmity or sporadic . . . slurs." Herrera, 474 F.3d at 680.

Aside from interactions related to SWPA's business decision to remove environmental duties from plaintiff, the only events on which she relies for her hostile work environment claim are comments made to her by Reeves, her exclusion from certain office functions and interactions, her complaints being ignored, and general avoidance and hostility in the workplace.  But while plaintiff may be dissatisfied as to how she was treated by SWPA employees, "discourteous treatment is simply not sufficient to impose liability under Title VII," as that statute is "neither a general civility code nor does it provide relief for the ordinary tribulations in the workplace [or] incidents of rudeness by coworkers." See Robinson v. Cavalry Portfolio Servs., LLC, 365 Fed. App'x 104, 120 (10th Cir. 2010)(unpublished)[39]; Hamby v. Assoc. Ctrs. for Therapy, 230 Fed. App'x 772, 781 (10th Cir. 2007)(unpublished); see also Somoza v. Univ. of Denver, 513 F.3d 1206, 1217 (10th Cir. 2008)(finding displays of rudeness, critical e-mails, and "air of superiority" not indicative of pervasively hostile work environment and noting that although "[a]ppellants may have had to withstand colleagues that do not like them, are rude, and may be generally disagreeable people . . . . . th[e] court's obligation is not to mandate that certain individuals work on their interpersonal

---

[39]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

skills").  Low has not made a showing that she was subjected to offensive conduct falling outside the office dynamics with which every employee must contend and for which Title VII provides no relief.  Because she has not created any genuine issue of material fact as to a pervasively hostile work environment, the Court will not consider whether the evidence is sufficient to link any hostility to a retaliatory animus.  Defendant is entitled to summary judgment on plaintiff's hostile work environment claim.

**B.**     **Discrimination based on Gender and/or Retaliation (Case No. 09-CV-0505)**

Low's remaining claim is that "she was intentionally discriminated against because of her sex and/or retaliation for a discrete employment action: failure to be permitted to apply for her supervisor's position in October of 2008."  Dkt. # 33, at 2.  Plaintiff argues that she engaged in protected opposition in the form of her previous lawsuit based on gender and defendant's failure to provide opportunity for promotion (what Low refers to as a "glass ceiling").  Dkt. # 62, at 24.  She further claims that she suffered an adverse employment action when she could not apply for Cooper's GS-15 position in October 2008 due to "legally insufficient qualifying experience at GS-14 level."[40]  Id.  Finally, she states that the bar to her advancement was put in place as a result of the settlement in 2000.  Id.  Defendant claims that Cooper's position was changed to an engineering series in response to a reorganization of SWPA that occurred in 2006 and a reevaluation of Cooper's

_____

[40]     Plaintiff's complaint is vague as to whether the adverse employment action to which she refers is the reclassification of Cooper's former position to include an engineering component or defendant's failure to provide supervisory experience allegedly required by the 2000 settlement agreement.  To the extent that plaintiff is attempting to base her claim on any "secret breach" of the settlement agreement, the Court has previously ruled that it lacks jurisdiction over such claim, as it was not brought in any of Low's EEOC charges.  Dkt. # 32, at 10.  Thus, the Court will limit consideration of any adverse action to the reclassification of Cooper's position and plaintiff's ability to apply.

responsibilities upon his retirement.  Dkt. # 62-2, at 4.  Although plaintiff appears to phrase her claim in terms of retaliation only, the Court will construe her pleadings broadly as stating a claim based on either gender discrimination or retaliation.

### i.        Discrimination Based on Gender

To establish a prima facie case of sex discrimination, plaintiff must show that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was otherwise qualified for the [position in question], and (4) she was treated less favorably than others not in the protected class."  Turner, 563 F.3d at 1142.  On a motion for summary judgment, if plaintiff does not present direct evidence of discrimination, the Court will consider her claim under the burden-shifting framework of McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  Under that analysis, plaintiff will first have the burden of making a prima facie case.  The burden then shifts to SWPA to articulate a legitimate, nondiscriminatory reason for its decision to alter the job requirements for Cooper's position to include engineering experience.  Id.  If it does, Low then has the burden to show that SWPA discriminated on the basis of sex, which she may satisfy by showing that the legitimate, nondiscriminatory reason for changing the position description was merely pretextual.  Id.  Plaintiff's burden in establishing a prima facie case is "slight," and "a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant."  Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005)(emphasis in original).

Low's briefs list approximately eighty "material facts."[41]  None of them constitutes direct evidence of discrimination.  "Direct evidence demonstrates on its face that the employment [decision] was discriminatory."  Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  In her discussion of the change in classification of Cooper's position, plaintiff argues that defendant has "continuously maintained a policy since 1964 of total exclusion of females at the GS-15 grade or higher, the level of senior management," and that "[s]ince 2000, [d]efendant has deceptively and intentionally denied [p]laintiff from legally qualifying for promotion to any federal position at any federal entity" by "knowingly . . . den[ying] the minimum qualifying experience time at the GS-14 level, necessary for promotion."  Dkt. ## 62, at 3; 74, at 10-11. However, "[s]tatistics taken in isolation are generally not probative of age discrimination." Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1110 (10th Cir. 2008)(citing Doan v. Seagate Tech., Inc., 82 F.3d 974, 979 (10th Cir.1996)).  Thus, presentation of statistical evidence showing a lack of women in management positions at SWPA does not, without more, constitute direct evidence of discrimination, even when construed in the light most favorable to plaintiff.  Low's attempts to rely on defendant's failure to provide her with supervisory experience as direct evidence is also misplaced, as those allegations are not properly before the Court.  The only other fact alleged that can be plausibly construed as relating to her discrimination claim is that Cooper's performance in his non-engineering capacity was rated in October 2007 as exceeding expectations, and that he received a cash bonus for his performance.  Id. at 14; Dkt. # 62-4, at 6-9.  However, the fact that

---

[41]     Most of Low's "facts" (many of which are actually legal conclusions and mere speculation) relate to her claim that she was improperly denied the benefit of her previous settlement agreement through the removal of her environmental duties and failure to gain supervisory experience; for the reasons stated above, those claims will not be considered.

Cooper received positive reviews is not direct evidence that changes to his position description had a discriminatory basis.[42] Thus, none of plaintiff's facts demonstrate discrimination on their face, and the Court must turn to the McDonnell Douglas analysis.

It is not disputed that Low, as a female employee, is a member of a protected class under Title VII. While there may be some dispute about whether the reclassification of Cooper's position from Assistant Administrator, Corporate Facilities to Supervisory Interdisciplinary Engineer was an adverse employment action, or whether plaintiff was qualified for Cooper's position prior to the change,[43] the Court need not reach those issues. Plaintiff has not demonstrated that the adverse employment action, if any, affected her differently than those outside the protected class. In fact, plaintiff's stated position is to the contrary, according to the following exchange at her deposition:

Q:     Why did they discriminate against you, do you believe?

A:     Gender.

Q:     Can you explain?

A:     Well, this was – that is a senior staff position. There's never been any females in the senior staff level. I believe they wanted to keep it that way.

Q:     Were women allowed to apply for this position?

A:     If you're an engineer of those three series.

       . . . .

---

[42]     Nor is plaintiff's extensive discussion of defendant's use of outside engineering firms relevant to her argument. Dkt. # 74, at 23.

[43]     Defendant claims that plaintiff would not have been qualified for Cooper's position because of her lack of supervisory experience. Dkt. # 72, at 12. Plaintiff testified that she was as qualified as Cooper, Dkt. # 70-5, at 6, and argues that defendant cannot rely on her lack of supervisory experience when that failure to gain supervision is the result of alleged wrongdoing by SWPA. Dkt. # 74, at 12-14.

Q:     How were you treated less favorably than males who did not have an engineering background with regard to this position?

A:     They couldn't apply either if they didn't – if they were not the series that was advertised.

Q:     So you were not treated differently than males who were similarly situated to you; is that correct?

A:     That's right.

Dkt. # 72-2, at 11.  Thus, by plaintiff's own admission, men were affected equally by the change to include Cooper's former position in the engineering series.  As before, her conclusory statements that she was discriminated against based on gender fail to create a genuine issue of material fact.  Because plaintiff provided no circumstantial evidence of disparate treatment,[44] there are no grounds on which to draw even an inference of discrimination.[45]  Low has not made a prima facie case of gender discrimination, and the Court need not engage in further analysis under <u>McDonnell Douglas</u> regarding whether defendant's reasons for changing the position to an engineering series were pretextual.  Dkt. # 74, at 20-24.  No genuine issue of material fact exists with regard to plaintiff's discrimination claim, and defendant is entitled to summary judgment on that ground.

---

[44]    Plaintiff does make the conclusory assertion that the failure to include relocation expenses in the position description evidences gender discrimination because it made it less likely for women to apply for the job. Dkt. # 77-3, at 15-16.  However, once again Low fails to provide any support for this allegation of dubious accuracy, and to create a genuine issue of material fact as to disparate treatment.

[45]    Low focuses on her attempts to discredit defendant's statements that her environmental duties were removed because of the heightened need for focus on safety at SWPA. Dkt. # 62-4, at 11-12.  However, pretext is irrelevant until plaintiff meets her prima facie burden.

ii.      **Retaliation**

Title VII prohibits "employer actions that discriminate against an employee . . . because [she] has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." Anderson v. AOL, LLC, 363 F. App'x 581, 585-86 (10th Cir. 2010)(unpublished)[46](internal quotations omitted).  Where no direct evidence of retaliation is provided, plaintiff's claim of retaliation will be considered under the burden-shifting framework of McDonnell Douglas. Id. at 586.  "Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of retaliation by demonstrating: (1) that he or she engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the employer's challenged action materially adverse; and (3) that a causal connection exists between the protected activity and the materially adverse action." Id.

Plaintiff's lawsuit in 1999 based on gender discrimination was a protected action under Title VII, and the Court will assume for purposes of summary judgment that the change in qualifying experience for Cooper's position was an objectively adverse action.[47]  Thus, all that remains of the prima facie case is a showing of a causal connection.  "A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct followed by adverse action.  Standing alone, temporal proximity between the protected conduct and the retaliatory conduct must be very close in time." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d

---

[46]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

[47]     Defendant argues that plaintiff has not made a showing of a materially adverse action because her motion for summary judgment states that the adverse action was her inability to qualify for the GS-15 position due to legally insufficient qualifying experience at the GS-14 level, an argument already rejected by the Court.  Dkt. # 72, at 11.

1215, 1228 (10th Cir. 2008).  "Unless an adverse action is very closely connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."  See MacKenzie, 414 F.3d at 1280.

Examining the summary judgment record, the Court finds that plaintiff has not shown any link between her protected conduct and the change in Cooper's position description.  The protected conduct took place in 1999, and the adverse employment action in 2008; an eight-year period is far too long to establish causation by temporal proximity.  Id. ("[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient"); see also Hall v. Interstate Brands Corp., 2010 WL 3565741, at * 3 (10th Cir. Sept. 15, 2010)(finding a three-month period between plaintiff's complaint and his suspension "was too long to establish causation by temporal proximity" and citing cases holding same).  Plaintiff's only argument in support of a causal nexus between her protected action and defendant's materially adverse employment decision is that the "October 2008 barrier or ceiling to the GS-15 level was put into place when ink was barely dry from the [s]ettlement [a]greement in the year 2000."  Dkt. # 62, at 24.  That argument is based on plaintiff's claims of defendant's "secret breach" of the settlement agreement over which this Court does not have jurisdiction.  Plaintiff has offered no other evidence from which a causal connection may be inferred between her lawsuit in 1999 and defendant's decision to change Cooper's position description to an engineering series in 2008.[48]  Even construing the allegations in her favor, Low still fails to make a prima facie case of

---

[48]     Even when questioned directly about the issue by defendant, plaintiff stated only that the change in position advertisement was due to a gender bias, not that it was the result of plaintiff's suit in 1999. Dkt. # 72-2, at 10-11.

retaliation; because no genuine issue of material fact exists as to this issue, defendant is entitled to summary judgment on this claim as well.

**IT IS THEREFORE ORDERED** that Plaintiff's Opening Motion and Brief for Summary Judgment (Dkt. # 62) is **denied**.

**IT IS FURTHER ORDERED** that Motion of Defendant Steven Chu For Summary Judgment and Brief in Support Thereof (Dkt. # 70) is **granted**.  A separate judgment is entered herewith.

**DATED** this 16th day of November, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT